### FREMONT v. METROPOLITAN ST. RY. CO.

(Supreme Court, Appellate Division, First Department. June 17, 1904.)

**1. CARRIERS—DEATH OF PASSENGER—STREET CARS—NEGLIGENCE—EVIDENCE—SUFFICIENCY.**

In an action against a street railroad for death of plaintiff's decedent, alleged to have resulted from the negligence of the street railroad at the time of decedent's attempt to board a car, evidence examined, and *held* insufficient to support a verdict for plaintiff.

Appeal from Trial Term, New York County.

Action by Henrietta A. Fremont, as administratrix of the estate of Francis M. Fremont, deceased, against the Metropolitan Street Railway Company. From a judgment for plaintiff, and an order denying a motion for new trial, defendant appeals. Reversed.

For former opinion, see 82 N. Y. Supp. 307.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

Charles F. Brown, for appellant.
John S. Wise, for respondent.

HATCH, J. The accident which is the subject of this action resulted in the death of plaintiff's intestate, and the claim is made that such death was the result of the negligence of the defendant, free from any act of the deceased contributing thereto. The case has been before this court upon a former appeal. Fremont v. Metropolitan Street Ry. Co., 83 App. Div. 414, 82 N. Y. Supp. 307. The facts connected with the accident were very fully stated in the opinion delivered in deciding the case, and we do not feel called upon to again restate them, except so far as the evidence has been changed upon the trial which was had following that decision. The former judgment was reversed upon two grounds—that no negligence was established upon the part of the defendant, which resulted in producing the injury, and for an error in the charge of the court to the jury. The latter question is not present in this record. The proof upon the former trial was to the effect that the deceased attempted to board the car while it was running at a rapid rate of speed; that he slipped from the running board of the car, and was dragged some distance, when he released his hold from the stanchions, and both legs were run over by the rear trucks of the car. There was no dispute but that, at the time when the deceased attempted to board the car, it was running

at a rapid rate of speed. Upon the present trial the proof was in all substantial respects the same, save that a new witness (Abrams) was called, who testified that the car came to a full stop at the point where the deceased boarded the same, and that immediately as he stepped upon the running board it began to move, when his foot slipped down and went under the car. This testimony was at variance with all the testimony upon both sides given upon the former trial and upon this. Upon the former trial Michael S. Lahey was called as a witness, and testified that he was a passenger awaiting to take the car; that it crossed the street to the point where he desired to board it, running at the rate of about four miles an hour; that he ran after it in very close proximity to the deceased, who was also running; that there was only an imperceptible slackening of the car as it reached the point where he and the deceased boarded it; and that as the deceased grasped the stanchions of the car with his hands, and got his feet upon the running board, the speed of the car was accelerated, and the deceased slipped from his place, and hung on until, from sheer exhaustion, he let go his hold, when his legs went under the car. Upon the present trial he changed his testimony by stating that the car, as it came to the point where he boarded it, perceptibly slackened its speed; and he would not testify that it was running, at the time when the attempt was made to board it, four miles an hour. Upon this change in the testimony, the court submitted the case to the jury upon two theories—one as to whether the car stopped at the point where the deceased attempted to board it; and, second, whether the motorman decreased the speed of his car to such a degree as to cause would-be passengers to believe that the car was coming to stop, and thereby cause a person acting with a reasonable degree of prudence to regard it as a practical invitation to board the car, and to think that he might safely do so. It is upon these two propositions that the case must stand or fall, and we are therefore to inquire with some care into the nature of the testimony which carried the case to the jury upon these two propositions.

Abrams testified that at about 5 o'clock in the evening of the day of the accident he was at the elevated station at Cortlandt and Church streets for the purpose of going home; that he saw quite a few people waiting for a car that was coming quite rapidly across Cortlandt street, and that he stepped on the first landing of the stairway—

"To see whether they would all get on the car. I had a presentiment that something was going to happen, and I waited, and the car pulled up about 25 feet further up than where it should have stopped, and the car stopped, and I seen them all get on; that is, the majority of them got on, except one or two persons. I seen this man that was killed. He stepped up, and just as he stepped up the car began to move, and both feet slipped under the car, and the wheels went right over him, and it was all over. I never saw this man before. I would not recognize the man if I saw him again."

Upon cross-examination he testified that he was present upon the first trial, and was not called as a witness; that he had a talk with counsel for the plaintiff; told them what he knew about the accident —that he had seen the car stop, and this man try to get on. After

88 N.Y.S.—48

making this statement to counsel, he was dismissed as a witness. He also again testified:

"I had a presentiment that something was going to happen. That presentiment was not because I saw a lot of people running for a car that was going so fast. They were not running for the car. They were all waiting there. That gave me a presentiment, because the car came so rapidly. I was curious to see whether the car would stop. The car rushed across Cortlandt street. That would give any one a presentiment. To see a lot of people there waiting to get on. I didn't think they would get on while it was moving."

He further testified that the man he saw was about 5 feet 7 inches, or 5 feet 8 inches, in height; that he knew he was not 6 feet tall; and that he would call him short. The wife of the deceased testified that he was "a 6-foot man, I think, in height, and weighed about 195 or 198 pounds." The platform upon which Abrams testified that he stood was 15 or 20 feet above the ground—that he looked down from that point, and that the whole stairway was blocked. The testimony of Abrams is improbable, because it is unnatural. One of the most familiar sights in this city is the running and stopping of street cars. The common impulse which seem to actuate the people of this city, almost without exception, who make use of elevated trains as a means of transportation, is to keep in motion from the time they begin the ascent of the stairways until they reach the platform and the train. The whole process is a rush to get to the train as speedily as possible. Innumerable street cars run upon the surface of the street beneath and cross intersecting streets frequently at a high rate of speed, and the situation is so common as not ordinarily to attract attention or excite comment. The statement that a car moving at a rapid rate of speed to a point where passengers had collected for the purpose of being transported provoked a presentiment in the mind of the witness that something was about to happen, and that he stopped upon the platform, thereby impeding the progress of other passengers, for the sole purpose of seeing whether a number of people would board a car, is improbable to the last degree. We can readily understand that, after the accident had happened, people would quite likely stop to look; but to say that prior to the happening of any accident a premonition of disaster was raised in the mind of the witness out of such a situation justifies the criticism that it is improbable, because unnatural, and, when this is coupled with the fact that the statement that the car stopped, contradicts the statement of every witness sworn upon the trial on either side, all of whom unite in saying that the car did not stop, and there having been prior physical conditions which prompted those charged with the operation of the car not to stop, in order that traffic might be equalized, we have presented testimony so improbable in its character, and so overwhelmingly disputed by other testimony, as to lead the mind irresistibly to the conclusion that the statement that the car stopped is incredible, and the finding of a jury based thereon is against the clear weight of the testimony.

The other theory which was submitted rested upon the testimony of the witness Lahey. To such testimony we have already adverted, and in detail it is very fully stated in the review of the evidence upon the former decision. Upon the present trial he testified that, when

the deceased and himself were running for the car, it was going at a pretty good speed. To use his exact language: "I won't say it was a rapid rate of speed. It was a pretty good speed." He admitted that on the former trial he testified that it was running more than four miles an hour. Upon the subject of the decreased speed as the car reached the point where he boarded it, he was asked:

"Q. Did you say that it slackened imperceptibly? A. I remember the word, sir. I said it at the coroner's inquest. I remember having said that. I remember having used that word. When will you allow me to qualify that word? I want to qualify it. I say I have some explanation that I want to give upon the use of the word 'imperceptible.' At the last trial, when you recalled to me that word, I made mention that I wanted to explain, and you said, 'By and by,' but you never gave me an opportunity. I will say now that the car did—I should say the word 'perceptible'—slow up there. The word 'imperceptible' was not the proper word to use. When I said at the former trial 'imperceptible,' and said at the coroner's inquest, two months after the accident, 'imperceptible,' I should have said 'perceptible.' I suppose I did probably mean 'perceptible.' It is three years ago. I meant for to qualify it. I will say that I used the wrong word on my oath. You putting me on my oath, I will say that I used the word wrongly. The word should have been 'perceptible,' not 'imperceptible.' To the Court: I didn't use the word advisedly and thoughtfully, your honor. I didn't."

He further stated that counsel spoke to him upon the subject prior to the present trial, and asked him:

"Are you sure that the word 'imperceptible' is the proper word to use? 'Well,' I said, 'it may and may not.' At the same time I told him that I would weigh the word, and that was the reason that I thought over the thing there. I weighed the word, and concluded to change it completely around—not to please the lawyer, but on seriously weighing the word, because I considered the car must have slackened to allow those gentlemen to get on."

Being further interrogated as to the cause of the change in his testimony, he said:

"I changed my testimony, then, after mature consideration—after reading the decision of the Appellate Court in this case. Q. So now you are willing to swear that what you said twice under oath on previous trials is not true? A. That it was not properly conveyed, sir. I have no interest whatsoever in the decision in the Appellate Division in this case. I was anxious to see it. I thought that the lower court would have been sustained, and I was surprised when I heard it was reversed. Q. What interest have you got in it? Is any of the verdict coming to you? A. None whatsoever, sir. I have no interest in it in any way. Q. To follow the decision of the Appellate Court in a case in which you were only a witness? A. I read the papers pretty closely. I saw it in the paper. In the New York Times. I think it was Judge Hatch that delivered the decision. It was a summary of the decision of the Appellate Division. Having read that, on mature deliberation, I find out that what I had twice said under oath didn't give the proper idea. To the Court: Didn't give the truthful idea."

Upon this subject the court charged:

"Had the deceased a right to take the chances of getting on a car which was in motion, though going at a diminished speed? Of course, if it was an open car, going at the rate of four or five miles an hour, and the deceased ran across the street, and took hold of the stanchion and tried to jump upon the running board, it would not take you very long to decide it, if the question were submitted to you, that he took his life in his own hands by so doing. But in that event there would be no question for you to determine, because the court would be compelled to nonsuit the plaintiff. Where the speed is so far slackened, however, that the car is merely crawling along, so to speak, it may

be that there is not much substantial difference between that and a full stop, and that a prudent man would be justified in attempting to board it. For a prudent man can get on when it is at a full stop, and a prudent man might get on if it was going slowly, so as to be almost at a full stop, and be taking no substantial risk. But if the car is going at an appreciable rate of speed, so that common sense would suggest that it would be more prudent to wait until it had come to a final stop, then the risk of running after such a car and jumping upon it would be that of the person making the attempt."

In view of the fact that Lahey had twice testified that the car was running more than four miles an hour, and upon the present trial stated that it was going at a "pretty good speed," and in view of the fact that the change in his testimony respecting the decreased speed of the car was provoked by the decision expressed by this court, we think the conclusion reached by the jury under the charge cannot be said to be supported by credible testimony, and that it is against the weight of the evidence. Aside from the testimony of Abrams, there is no evidence, in the most favorable aspect of plaintiff's case, which shows that this car was running slowly—barely crawling along. The physical action of Lahey and the deceased rebut any such presumption. A signal had been given to the motorman to bring his car to a stop. Evidently this was not heeded. Both the witness and the deceased were in hot pursuit—on a run to catch it—and, when they caught it, it was running at a pretty good rate of speed. In addition to this, Lahey testified respecting the use of the word "imperceptible":

"I meant to convey on the previous trial that the car slowed up so very slightly that one could hardly notice it. I meant to convey the idea that it had slowed up so very much that no one could help noticing it. I mean that there was a perceptible—that is, in such a way that it was possible for a man to board the car with safety."

The question submitted by the court to the jury was whether the car had been so far decreased in its speed that a person acting with a reasonable degree of prudence might get on "if it was going slowly, so as to be almost at a full stop, and be taking no substantial risks," but that if it was going at an appreciable rate of speed, so that a prudent person would deem it unsafe to take the risk, then it would be negligence to attempt to board it. Lahey's testimony upon this subject, when finally summed up, is that he thought it was possible to board the car with safety. It is evident, therefore, that the evidence of Lahey can scarcely be said to be a justification for the charge as made. Certainly the evidence is not sufficient in support of a finding based upon Lahey's testimony, and, when it is considered in its entirety, the contradiction and change, and the reason for it, we have no hesitation in concluding that the verdict based thereon should not be supported.

These views lead us to the conclusion that the judgment and order should be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur; INGRAHAM, J., in result.